1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                        SOUTHERN DISTRICT OF CALIFORNIA

10

11  SAMUEL LEE MEDWAY,                    )    Case No. 10cv276-BEN (BLM)
                                          )
12                    Petitioner,         )    **REPORT AND RECOMMENDATION**
    v.                                    )    **FOR ORDER GRANTING PETITION**
13                                        )    **FOR WRIT OF HABEAS CORPUS**
    MATTHEW CATE, Warden, et al.,         )
14                                        )
                      Respondents.        )
15  ─────────────────────────────────    )

16          This Report and Recommendation is submitted to United States District Judge Roger T.

17  Benitez pursuant to 28 U.S.C. § 636(b) and Civil Local Rules 72.1(d) and HC.2 of the United

18  States District Court for the Southern District of California.

19          On February 2, 2010, Petitioner, a state prisoner proceeding *pro se*, filed a Petition for

20  Writ of Habeas Corpus.  ECF No. 1.  Petitioner challenges the November 24, 2008 decision by

21  the Board of Parole Hearings ("Board") denying him parole.  Id.  On June 9, 2010, Respondent

22  filed an answer requesting that the Petition be denied.  ECF No. 12.  Petitioner filed a traverse

23  on July 9, 2010.  ECF No. 13.

24          This Court has considered the above documents as well as the record as a whole.  Based

25  thereon, and for the reasons set forth below, this Court **RECOMMENDS** that Petitioner's Petition

26  for Writ of Habeas Corpus be **GRANTED**.

27  ///

28  ///

### FACTUAL AND PROCEDURAL BACKGROUND

The following factual summary is taken from the transcript of the November 24, 2008 parole hearing, which the Board indicated it was reading into the record from the probation officer's report[1]:

> At approximately 7:50 a.m. on May the 30th, 1977 an officer from the San Bernardino Police Department was dispatched to American and West Baldwin Street regarding a possible alcoholic sleeping under a trailer on a vacant lot. When the officer went to investigate, he found the body of a man who was later identified through his fingerprints as 33-year-old Dallas Foster. The autopsy performed by Dr. Irving Pruitt on May the 30th, 1977 revealed that the victim had been severely beaten prior to his death that was due to a bullet wound behind his left ear. There were abrasions and lacerations.

> In addition to the gunshot wound to the head, Mr. Foster also sustained two other gunshot wounds, six fractured ribs on the left side and two on the right side, his skull had been fractured, both cheekbones, his nose and his jaw broken. It was also found that he had a blood alcohol level of .41. The discovery of the body initiated an intense police investigation which began with a door-to-door check with residents in the area where the victim was found. The information obtained from this canvas of the neighborhood directed the investigators' attention to a party which had taken place on the evening of May the 27th, 1977. Through interviews it was learned that those attending the party on May 27th had been the residents of that address, Conrad Ray, his roommate, which was the inmate, the inmate's girlfriend, Clara Lavatos, L-A-V-A-T-O-S, and her two children, ages three years and eighteen months. Also present was Mr. Ray's juvenile girlfriend, Joy Pasillas, P-A-S-I-L-L-A-S, Julian Tomaio and two male juveniles. Those present were drinking bottles of wine and beer, some of the individuals were also sniffing spray paint. Sometime around 3:00 to 3:30 on the afternoon of May the 27th, the victim, Dallas Foster, who was on his way to hop a train to Bakersfield to work in the field, knocked on their door and asked for a drink of water. He was invited in and given a drink of wine. Approximately one hour after Mr. Foster arrived, the inmate began to make a statement to the effect that Mr. Foster had pulled a knife on Mr. Ray some months earlier. The inmate became insistent on this point, asking Mr. Ray what he was going to do about it, to which Mr. Ray responded by hitting Mr. Foster in the mouth, knocking him to the floor, where Mr. Ray began kicking him. The other males present joined in the beating and kicking of Mr. Foster, which continued for some minutes. Throughout the remainder of the evening until approximately midnight the victim was repeatedly beaten on perhaps seven or eight separate occasions. During these beatings the victim was punched, kicked, stomped on and beaten with a belt and with a two-by-four piece of lumber. The beating was not continual, with the participants stopping from time to time to take a break, drinking more wine or beer or sniffing paint, then returning to beating the victim. At one point the victim became so bloody that he was taken to the bathroom by the inmate and one of the male juveniles in order to change his clothes. While he was nude, he was brought into the living room and paraded

---

[1]  The Court relies upon this factual summary because neither party provided the Court with the Court of Appeal's decision on direct review or any other contemporaneous factual summary. The Court notes that neither Petitioner's counsel nor the district attorney objected during the parole hearing to use of this factual record.

10cv276-BEN (BLM)

before the two women and two small children who were present.  During this time, while the victim was laying on the floor naked, he was crying and asking them to leave him alone.  After he was returned to the bathroom, the male juvenile came out and stated they were trying to hang him in the bathroom with a belt.  Later, when the victim was lying on the floor unconscious, one of the male juveniles urinated on his face into his open mouth.  According to Mr. Ray, on two occasions the male juvenile filled the bath with urine, which the inmate then made the victim drink, threatening to kill him if he did not.  On another occasion Mr. Tomaio attempted to smother the victim with a towel.  In the course of the evening the inmate made a statement to the effect that they could not allow the victim to leave because he would go to the police.  Mr. Tomaio responded, 'Well, let's kill him,' and on at least three separate occasions Mr. Tomaio held a .22 caliber automatic rifle within inches of the victim's face, cocked the weapon and pulled the trigger as the victim begged not to be killed.  On each of these occasions the weapon was empty.  At midnight the victim was carried from the apartment by Mr. Tomaio and one of the male juveniles.  The inmate and Ms. Pasillas accompanied the others as the victim was taken to the vacant lot in order to set him under the trailer, where Mr. Tomaio shot him first in the head, then in the neck and in the stomach.  As they were leaving the apartment, the inmate had ordered Mr. Ray to dispose of the victim's belongings.  When they returned to the apartment, the inmate instructed the others to clean up the blood and not to tell anyone what had happened.

Lodgment 7 at 15-19.

Petitioner was convicted of first degree murder and committed to prison on December 1, 1977, for a term of seven years to life. Pet'r Mem.[2]  On October 8, 2003, at his fourteenth parole hearing, Petitioner was granted parole.  Id. at 1-2.  The Governor of California reversed Petitioner's parole grant on March 5, 2004.  Id. at 2.  On November 24, 2008, Petitioner went before the Board again and this time the Board found Petitioner unsuitable for parole.  Id.  It is this 2008 decision that Petitioner challenges in the instant Petition.  Id.

Petitioner challenged the Board's decision in a habeas petition filed in the Superior Court of California, County of San Bernadino on June 2, 2009.  Lodgment 1.  The superior court denied his petition in a reasoned decision on October 14, 2009.  Lodgment 2.  Petitioner then raised the same arguments in a habeas petition before the California Court of Appeal, Fourth District, Division Two, which that court summarily denied.   Lodgments 3 & 4.  Finally, Petitioner challenged the Board's decision in the California Supreme Court.  Lodgment 5.  That court

---

[2] Petitioner completed the standard Petition for Writ of Habeas Corpus form and then attached a typewritten "Petition for Writ of Habeas Corpus."  ECF No. 1.  Page 4 of the typewritten petition marks the beginning of the "Memorandum of Points and Authorities" section.  Id.  In order to differentiate the typewritten document from the form petition, the Court will refer to the entire typewritten document (petition and memorandum) as "Pet'r Mem."

summarily denied his habeas petition without citation of authority on January 21, 2010. Lodgment 6.

While Petitioner was pursuing state collateral relief, he appeared before the Board for another hearing on October 22, 2009, and once again, was denied parole. Lodgment 8. It does not appear Petitioner is challenging the 2009 Board decision in the instant Petition and the Court, therefore, will not address it.

## SCOPE OF REVIEW

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a) (1996).

The Petition was filed after enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Under 28 U.S.C. § 2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996). Summary denials constitute adjudications on the merits. See Luna v. Cambra, 306 F.3d 954, 960 (9th Cir.) (citing Hunter v. Aispuro, 982 F.3d 344, 347-48 (9th Cir. 1992)) amended by 311 F.3d 928 (9th Cir. 2002). Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).

A state court's decision is "contrary to" clearly established federal law if the state court:

(1) "applies a rule that contradicts the governing law set forth in [Supreme Court] cases"; or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

A state court's decision is an "unreasonable application" of clearly established federal law where the state court "'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413). "[A] federal habeas court may not issue [a] writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be *objectively unreasonable*." Id. at 75-76 (emphasis added) (citations and internal quotation marks omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

Finally, habeas relief also is available if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2) (1996); Wood v. Allen, 130 S.Ct. 841, 845 (2010). A state court's decision will not be overturned on factual grounds unless this Court finds that the state court's factual determinations were objectively unreasonable in light of the evidence presented in state court. See Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); see also Rice v. Collins, 546 U.S. 333, 341-42 (2006) (the fact that "[r]easonable minds reviewing the record might disagree" does not render a decision objectively unreasonable). This Court will presume that the state court's factual findings are correct, and Petitioner may overcome that presumption only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

///

///

///

## DISCUSSION

Petitioner posits two claims for relief.  First, Petitioner argues that the Board's parole denial was based on an unreasonable determination of the facts and the court decision affirming the denial was not supported by the requisite "some evidence."  Petitioner asserts the denials violated his rights under the Fifth and Fourteenth Amendments of the United States.  Pet'r Mem. at 3-12.  Second, Petitioner argues that he must be released immediately because any state action causing a prisoner to serve prison time in excess of the term prescribed under the Indeterminate Sentencing Law guidelines violates the Ex Post Factor Clauses of the State and Federal constitutions.  Id. at 3, 12-16.  Respondent contends Petitioner is not entitled to relief.  Mem. P. & A. Supp. Answer ("Resp't Mem.") at 3-11.

**A.    Respondent Repeats Legal Arguments Rejected by the Ninth Circuit**

In his answer, Respondent correctly states that there is no federal constitutional requirement that there be "some evidence" supporting a parole board's decision to deny parole to an inmate.  Resp't Mem. at 4.  Because there is no independent, federal requirement and the courts must rely on the state requirement, Respondent argues that this Court is limited to reviewing "whether the state's parole review procedures are fundamentally unfair" and may not review the sufficiency of the "some evidence" determination made by the state court.  Id. at 3-9.  Respondent's argument misinterprets and misapplies the Ninth Circuit's recent decision in Hayward v. Marshal, 603 F.3d 546 (9th Cir. 2010) and ignores the Ninth Circuit's subsequent analysis and ruling in Pearson v. Muntz, 606 F.3d 606 (9th Cir. 2010).

The Due Process Clause of the Fourteenth Amendment protects individuals from deprivations of life, liberty or property.  It has long been established Supreme Court law that a liberty interest may arise from an expectation or right created by a state statute or regulation.  See, e.g., Wolff v. McDonnell, 418 U.S. 539, 556-58 (1974) (holding that the Due Process Clause ensures that state-created liberty interests are not arbitrarily abrogated); see also Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (internal citations omitted) (reconfirming that "[a] liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies").  As

10cv276-BEN (BLM)

the Ninth Circuit recently recognized, "[i]t is beyond doubt that state statutes, and *a fortiori*, state constitutions, 'may create liberty interests in parole release that are entitled to protection under the Due Process Clause.'" Pearson, 606 F.3d at 610-11 (quoting Bd. of Pardons v. Allen, 482 U.S. 369, 371 (1987)). California has created just such a liberty interest.

Under California law, a prisoner sentenced to an indeterminate life term is sentenced to a life term, "subject only to the ameliorative power of the [parole authority] to set a lesser term." Hayward, 603 F.3d at 561 (quoting People v. Wingo, 14 Cal. 3rd 169, 182 (1975)). The governing statute requires the Board to consider specifically-enumerated factors in evaluating the prisoner's suitability for parole and to grant parole unless it determines that public safety requires a longer period of incarceration. In re Rosenkrantz, 29 Cal. 4th 616, 654 (2002) (citing Cal. Penal Code § 3041(b)). There are six factors tending to show unsuitability for parole and nine factors that the statutes direct the Board to deem indicative of parole suitability. Cal. Code Regs., tit. 15 §§ 2281(c)-(d) & 2402(c)-(d)[3]. However, while these factors must be weighed in evaluating the appropriateness of parole, "the paramount consideration for both the Board [of Prison Terms] and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety." Hayward, 603 F.3d at 562 (quoting In re Lawrence, 44 Cal.4th 1181, 1210 (2008)). There must be "some evidence" of a current threat to public safety in order to deny parole and the commitment offense alone does not establish current dangerousness. Cooke v. Solis, 606 F.3d 1206, 1214 (9th Cir. 2010) (citing Lawrence, 44 Cal. 4th at 1213 and Hayward, 603 F.3d at 562). The Board or Governor may consider the aggravated circumstances of the commitment offense, but the record also must establish "that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." Lawrence, 44 Cal. 4th at 1214; Cooke, 606 F.3d at 1214.

---

[3] Because the underlying murder in this case was committed prior to November 8, 1978, title 15, section 2281 governs Petitioner's parole suitability. Lawrence, 44 Cal. 4th at 1202 n.5. Title 15, section 2402, which is identical to section 2281, provides parole factors and guidelines for murders committed on or after November 8, 1978. Id.

On federal habeas review of a prisoner's claim that the Board or the Governor denied parole in the absence of "some evidence" of current dangerousness, courts in this circuit "need only decide whether the California judicial decision approving the [Board or] governor's decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" Hayward, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2)); Pearson, 606 F.3d at 608 (including decisions of the parole board in the Hayward analysis); see also Boyd v. Newland, 467 F.3d 1139, 1152 (9th Cir. 2006) ("[i]n general, Ninth Circuit precedent remains persuasive authority in determining what is clearly established federal law").

Respondent argues that under Hayward, this Court may not review *how* the state court applied the "some evidence" test because doing so would run afoul of AEDPA's limitation of habeas relief to misapplications of federal, as opposed to state, law. Resp't Mem. at 7. Rather, Respondent contends the Court is limited to the following two-step analysis: "(1) is the state court procedure at issue fundamentally adequate to vindicate the state interests afforded Medway; and (2) if so, did California in fact provide Medway the procedures required under state law." Id. at 8. Because Hayward did not find California's procedural "some evidence" requirement inadequate to vindicate the rights afforded under California's statutes and because California provided Medway with the required procedural review, Respondent contends Petitioner is not entitled to further review or relief from this Court. Id. at 8-9.

The Ninth Circuit addressed and rejected this precise argument in Pearson[4], explaining:

> [T]he State contends that Hayward limits federal habeas review to a cursory examination of *whether* a state court identified and applied the California "some evidence" requirement, rather than an examination of *how* the state court applied the requirement. Again, the State's argument is based on a fundamental misunderstanding of the Hayward holding quoted above. Hayward specifically commands federal courts to examine the reasonableness of the state court's application of the California "some evidence" requirement, as well as the reasonableness of the state court's determination of the facts in light of the

---

[4] Respondent was aware of the Pearson holding as Pearson was filed on May 24, 2010 and Respondent did not file his Answer until June 9, 2010. In fact, Respondent cites Pearson in his memorandum. See Resp't Mem. at 4. However, Respondent fails to distinguish Pearson or to justify his argument in light of the reasoning and holding set forth in Pearson.

1     evidence. <u>Hayward</u>, 603 F.3d at 562-63. That command can only be read as
2     requiring an examination of how the state court applied the requirement.
      Moreover, after examining the particular state court decision at issue, <u>Hayward</u>
3     concluded that the district court properly denied the writ because "[t]here was
      some evidence of future dangerousness" justifying the denial of parole, 603 F.3d
      at 563, and not merely because the state court purported to identify some
4     evidence of future dangerousness. In short, the <u>Hayward</u> court itself performed the
      function that the State argues it forbade. Indubitably, <u>Hayward</u> neither announced
5     nor applied the test now urged by the State.

6  <u>Pearson</u>, 606 F.3d at 609.[5]  Furthermore, this Court is not persuaded by Respondent's argument

7  that interpreting <u>Hayward</u> as requiring an analysis of *how* the state court applied the "some

8  evidence" test is contrary to well-established Supreme Court authority prohibiting federal habeas

9  review of state court determinations on questions of state law.   See Resp't Mem. at 7-8.

10  Respondent cites to <u>Pully v. Harris</u>, 465 U.S. 37, 41 (1984) and <u>Estelle v. McGuire</u>, 502 U.S. 62,

11  67-68 (1991) for this proposition.  <u>Id.</u> at 8.  Both of those decisions do, in fact, make clear that

12  "[a] federal court may not issue the writ on the basis of a perceived error of state law." <u>Pulley</u>,

13  465 U.S. at 41; <u>see</u> <u>also</u> <u>Estelle</u>, 502 U.S. at 67-68 ("we reemphasize that it is not the province

14  of a federal habeas court to reexamine state-court determinations on state-law questions").

15  However, the Supreme Court repeatedly has explained that federal habeas courts *are* tasked

16  with evaluating state courts' applications of state laws to the extent necessary to determine

17  "whether the state court's finding was so arbitrary or capricious as to constitute an independent

18  due process or Eighth Amendment violation."   <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990);

19

20
      _____

21        [5]  The California Supreme Court rejected essentially this same argument when it was put forth by the
     Governor, explaining:

22        Although we emphasized that a court's review should be highly deferential, we rejected the
        Governor's contention that the judicial branch is authorized to review parole decisions only to ensure
23        that all *procedural safeguards* have been satisfied, but not to consider the *merits* of a parole decision.
        ([*In re*] *Rosenkrantz,* [2002] 29 Cal.4th 616[,] 657, 128 Cal.Rptr.2d 104, 59 P.3d 174.) In doing so,
24        we cautioned against a less stringent standard of review that would permit the Board to render a
        decision without any "basis in fact" and not supported by any evidence in the record simply because
25        "the decision, on its face, recited supposed facts corresponding to the specified factors and appeared
        reasonable." ( *Id.* at p. 665, 128 Cal.Rptr.2d 104, 59 P.3d 174.) Such a decision would be arbitrary
26        and capricious and, because it affects a protected liberty interest, would violate established principles
        of due process of law. ( *Ibid.*)

27
  <u>Lawrence</u>, 44 Cal. 4th at 1204-05.

28

see also Pulley, 465 U.S. at 41 (acknowledging that "an error of state law could be sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment"); Estelle, 502 U.S. at 68 (evaluating "the question whether the admission of the evidence [by the state court] violated McGuire's federal constitutional [Due Process] rights").

Respondent's summary of District Attorney's Office v. Osborne, __ U.S. __, 129 S.Ct. 2308 (2009) in support of his position is equally misleading. See Resp't Mem. at 6. In Osborne, the Supreme Court considered whether the petitioner had "a right under the Due Process Clause to obtain postconviction access to the State's evidence for DNA testing." Osborne, 129 S.Ct. at 2316. As in prior cases of this nature, the Court determined that *the state* afforded the petitioner "a liberty interest in demonstrating his innocence with new evidence *under state law*." Id. at 2319 (emphasis added). Respondent incorrectly asserts that the Osborne Court "simply determined that the state's procedures were not fundamentally inadequate and then looked to see if the petitioner received those protections" and that, therefore, Osborne stands for the proposition that federal courts should not review *how* the state applies its procedures. See Resp't Mem. at 6. To the contrary, the Osborne Court expressly noted that it could not address whether the state's "newly developing procedures for obtaining postconviction access to DNA" worked "in practice" because the petitioner "ha[d] not tried to use the process provided to him by the State or attempted to vindicate the liberty interest that is now the centerpiece of his claim." Osborne, 129 S.Ct. at 2321. In other words, the Court did not say it *would* not address whether the state properly applied its procedures, it said that it *could* not under the facts of the case.

This Court also briefly addresses Respondent's argument that the "some evidence" standard established in Superintendent v. Hill, 472 U.S. 455 (1985) is not clearly established federal law for purposes of federal review of a state parole decision, and therefore, cannot be grounds for Petitioner to obtain habeas relief. Resp't Mem. at 9. Respondent is absolutely correct that the Hayward court held that Hill is not on point and that "[t]here is no general federal constitutional 'some evidence' requirement for denial of parole." Hayward, 603 F.3d at

559.  However, once again, this is not the whole story.  The full quote from <u>Hayward</u> is "[t]here is no general federal constitutional 'some evidence' requirement for denial of parole, *in the absence of state law creating an enforceable right to parole.*"  <u>Id.</u> (emphasis added).  While the court found no federal constitutional "some evidence" standard, the <u>Hayward</u> court concluded that a state court finding of "some evidence" was part of the liberty interest in parole release created by California's system and that this liberty interest is "entitled to protection under the Due Process Clause."  <u>Id.</u> at 561 (quoting <u>Allen</u>, 482 U.S. at 371).

Accordingly, this Court finds no support for Respondent's argument that this Court's review is limited to evaluating the procedures utilized by the State.

**B.**   **The Board's Decision Denying Parole was an Unreasonable Application of California's "Some Evidence" Requirement and was Based on an Unreasonable Determination of the Facts in Light of the Evidence Presented**

Having rejected Respondent's legal arguments, this Court now turns to the proper standard of review in this case, which is "whether the California judicial decision approving the [Board or] governor's decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'"  <u>Hayward</u>, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2));  <u>Pearson</u>, 606 F.3d at 608.  Petitioner argues that Board's decision denying him parole was based on an unreasonable determination of the facts.  Pet'r Mem. at 3-12.  Respondent only made the legal arguments discussed above and did not address whether the state courts unreasonably applied California's "some evidence" requirement or based their decisions on an unreasonable determination of the facts.

In this case, the California Supreme Court and the California Court of Appeal summarily denied Petitioner's claim, so this Court must "look through" these silent denials to the superior court's reasoned decision.  <u>Ylst</u>, 501 U.S. at 804.  The superior court explained:

> As the Supreme Court has stated, "Parole applicants have an expectation of being granted parole unless the Board finds, <u>in the exercise of its discretion</u> that the applicant is unsuitable."  The operative words are "in the exercise of its discretion".  Judicial review of this discretion is limited only to a determination as to whether there is "some evidence" in the record to support the decision.  As stated earlier, that "some evidence" must go to the core statutory determination that Petitioner remains a current threat to public safety.  The Supreme Court has noted that the

standard of "some evidence" is extremely differential (sic) towards the Board. The Supreme Court in <u>Lawrence</u> directed the Board to look at the commitment offense within the context of the prisoner's pre- and/or post-incarceration history, as well as his current demeanor and mental state. Appellate decisions continue to allow the Board to consider strongly the prisoner's commitment offense. In the recent case of <u>In Re Smith</u>, (2009) 171 Cal.App.4th 1631 at 1639, the Court held as follows:

> "The gravity of Respondent's commitment offense has continuing predicted value as to current dangerousness in view of her lack of insight into her behavior and refusal to accept responsibility for her personal participation."

As the government correctly points out and as the board members noted, the Petitioner has not fully accepted responsibility for the victim's death. This is the case because Petitioner insists that he is not fully responsible because he was not the shooter, rather he only beat the victim. In response to Petitioner's statements to the Board the Government refers this Court to <u>In Re Bettencourt</u>, (2007) 156 Cal.App.4th 780. In that case, it is noted that an accomplice's liability is derivative to the perpetrator, and so Petitioner is fully responsible for all acts committed during the course of the murder.

The psychological report by Dr. Turner is certainly supportive of parole. On Page 9 of that report, the evaluator opined that Petitioner has "largely accepted". He notes that the Petitioner has programmed in an "exemplary" manner earning his GED, four vocational certificates, and is a valued person assisting staff at Centinela State Prison. Petitioner was also noted to have positive parole plans with respect to employment and living arrangements. It was further noted that during his term of incarceration, Petitioner had received only four CDC 115's and two CDC 128's but has maintained a disciplinary free status for many years.

The Board did consider the positive factors, which favored parole, and made its findings that these did not outweigh the factors surrounding the circumstances of the life crime, taking into account the prisoner's pre- and post-incarceration history. While the decision did not reflect the weighing process of the Board, in (sic) the case of <u>In Re Rosenkrantz</u>, (2002) 29 Cal. 4th 616, clearly states that the Board need not explain its decision, where the precise manner in which the specific facts where (sic) relevant to parole suitability. This consideration and balancing lay within the discretion of the Board. Here the Board found that the identified facts were probative on the central issue of current dangerousness when considered in light of the full record before the Board.

The Court cannot substitute its own judgment for that of the board members. A review of the record discloses that the Board's observations were valid and consisted of "some evidence" in support of a finding of nonsuitability with a one year denial and does comport with the Supreme Court's most recent directions in the cases of <u>Lawrence</u> and <u>Shaputis</u>.

Lodgment 2 at 3-5.

Here, the superior court's opinion does not clearly specify which of the Board's findings it believes supported the parole denial. Instead, the court largely deferred to the Board's

judgment, concluding generally that "[a] review of the record discloses that the Board's observations were valid and consisted of 'some evidence.'" Id. at 5.  Under these circumstances, this reviewing court must examine each of the Board's reasons for denying parole in order to evaluate the reasonableness of the superior court's decision.  See Cooke, 60 F.3d at 1214.  In so doing, the Court is cognizant of the fact that the Board is charged with applying California parole regulations, which call for consideration of enumerated circumstances that "tend to indicate unsuitability for release" as well as those that "tend to show that the prisoner is suitable for release."  Cal. Code Regs., tit. 15 § 2281(c)-(d).  However, while these factors may guide the Board's decision, the ultimate question is whether there is "some evidence" of a current threat to public safety "and not merely evidence that supports one or more of the Board's subsidiary findings."  Pirtle v. Cal. Board of Prison Terms, 611 F.3d 1015, 1021 (9th Cir. 2010).

The decision of the 2008 Board panel is the only one being reviewed by this Court.  The 2008 Board panel based its decision on the following factors:

1) The commitment offense

2)  Petitioner's failure to profit from society's attempts to correct his criminality prior to his commission of the commitment offense

3) Petitioner's problematic relationship with his step-father prior to the commitment offense

4) Petitioner's lack of insight into the crime and failure to take full responsibility

5) Petitioner's desire to do things his way, failure to participate sufficiently in self-help programs, and his sense of entitlement to parole

6) Unrealistic parole plans and a vague employment offer

7) District Attorney's opposition to his release

Lodgment 7 at 109-124.  The Court will address each of these considerations in turn.

### 1.    The Commitment Offense

The Board first relied upon the commitment offense, which took place thirty-one years before the hearing.   Specifically, the Board described the commitment offense as "a dispassionate and very horrible crime where the victim was abused, he was defiled, and it clearly demonstrated an exceptionally callous disregard for human suffering."  Lodgment 7 at 110.  The

1    presiding commissioner went on to note that "[i]t appeared that the motive for this was strictly

2    for fun or relaxation – not relaxation, fun, and I really can't see, really, a good motive for it."

3    Id. at 110-11.  He also found it troubling that "after the fact, after the crime, [] [Petitioner]

4    instructed others to clean up everything so that it would appear that none of [them] were

5    involved in this tragic event."    Id. at 111.  While the Board acknowledged awareness of the

6    recent California Supreme Court decisions (In re Lawrence and In re Shaputis) barring use of the

7    commitment offense alone as a basis for denying parole and requiring that some "nexus" be

8    found that made the prisoner a continuing safety risk (id. at 109), it did not make clear which

9    "nexus" it relied upon in this case.

10       In reviewing the facts of Petitioner's commitment offense, this Court experienced the

11   same sense of horror and disgust that numerous Board panels and the Governor seem to have

12   felt in the past.  However, the law now is crystal clear that the commitment offense, no matter

13   how gruesome, is not sufficient by itself to justify the denial of parole.  Lawrence, 44 Cal. 4th at

14   1214; Cooke, 606 F.3d at 1214.

15       Because the law is clear that the commitment offense alone cannot establish current

16   dangerousness, the Court looks to the other reasons cited by the Board in order to determine

17   whether the record establishes "that something in the prisoner's pre- or post-incarceration

18   history, or his or her current demeanor and mental state, indicates that the implications

19   regarding the prisoner's dangerousness that derive from his or her commission of the

20   commitment offense remain probative to the statutory determination of a continuing threat to

21   public safety."  Lawrence, 44 Cal. 4th at 1214; Cooke, 606 F.3d at 1214.

22       **2.    Petitioner's Record Prior to the Commitment Offense**

23       One basis for the Board's denial was that Petitioner "clearly" failed to profit from society's

24   previous attempts to correct his criminality.  Lodgment 7 at 112.  In support of this assertion,

25   the Board noted that one of Petitioner's probationary periods occurred when he was a juvenile

26   and another was imposed in Petitioner's adulthood.  Id.  While the record is somewhat unclear

27   as to the dates and dispositions of Petitioner's prior convictions, it appears the first probationary

28   period occurred in 1974 (at age 20) and resulted from a prowling conviction and the second, in

1976 (at age 22), stemmed from a conviction for entering without consent.  Id. at 36; Pet'r

Mem., Ex. H (record of prior convictions) & D (2003 mental health evaluation at 9-10).  Assuming

it is an accurate statement that a twenty year old was considered a juvenile in 1974, the Board

fails to elaborate on how these two relatively minor, non-violent convictions over thirty years ago

can reasonably be viewed as evidence that Petitioner posed an unreasonable risk to public safety

in 2008.

        In fact, none of the records of Petitioner's prior convictions are for violent crimes.  See

Lodgment 7 at 34-36; Pet'r Mem., Ex. H (record of prior convictions) & D (2003 mental health

evaluation at 9-10); Traverse Mem. at 11.  This is significant because under the California

regulations established to guide Board decisions, the fact that "[t]he prisoner lacks any

significant history of violent crime" is listed as a "circumstance tending to show **suitability**" for

parole.  Cal. Code Regs., tit. 15, § 2281(d)(6) (emphasis added).  In a recent Ninth Circuit case,

the Board based its parole denial on a finding that the petitioner "failed to profit from society's

previous attempts to correct his criminality," and that the petitioner "cannot be counted on to

avoid criminality."  Pirtle, 611 F.3d at 1022-23.  In rejecting this ground for denying parole, the

court concluded that the petitioner's two short jail terms for non-violent, alcohol-related offenses

did not serve as evidence that he "cannot be counted on to avoid criminality."  Id. at 1023.  As

the court explained, "[t]o hold otherwise would be to create a per se rule that any inmate who

previously spent time in jail for any crime, no matter how minor, 'cannot be counted on to avoid

criminality' and is therefore unsuitable for parole."  Id.; see also Cooke, 606 F.3d at 1215

(rejecting the board's use of ten-year-old minor and non-violent disciplinary infractions as bases

for denying parole).  This reasoning applies with equal force to the instant case.  In other words,

Petitioner's supposed "fail[ure] to profit from society's previous attempts to correct [his]

criminality" is just as immutable a reason as the commitment offense to deny parole.[6]  The Board

---

[6] As one district court succinctly explained:

Whether the facts of the crime of conviction, or other unchanged criteria, affect the parole eligibility
decision can only be predicated on the "predictive value" of the unchanged circumstance. Otherwise,
if the unchanged circumstance per se can be used to deny parole eligibility, sentencing is taken out
of the hands of the judge and totally reposited in the hands of the BPT. That is, parole eligibility

1   provided no nexus between Petitioner's non-violent criminal history and a finding of current

2   dangerousness and the Court finds no evidence that a rational connection between the two

3   exists.

4          It also should be noted that Petitioner has an exemplary record in prison.  His most recent

5   disciplinary infraction of any kind was in 1990—twenty years ago—and it was an unexcused

6   absence.  Lodgment 7 at 40.  In total, he has received only 4 "115s" (i.e. serious rules violations,

7   the last being in 1987 for hiding during the inmate count) and 3 "128s" (administrative rules

8   violations).[7]  Id.  Thus, it appears that since his incarceration, Petitioner has profited from

9   society's attempts to correct his criminality.

10         **3.   Unstable Social History**

11         The Board also cited Petitioner's problematic and abusive relationship with his step-father,

12   which resulted in Petitioner running away from home at age thirteen and living on the streets

13   when he could not stay with friends.  Lodgment 7 at 33, 112.  One of the factors indicating

14   unsuitability for parole is that "[t]he prisoner has a history of unstable or tumultuous

15   relationships with others."  Cal. Code Regs., tit. 15, § 2281(c)(3).  However, while Petitioner's

16   relationship with his step-father may have been indicative of some instability during Petitioner's

17   _____

18         could be indefinitely and forever delayed based on the nature of the crime even though the sentence
      given set forth the possibility of parole--a sentence given with the facts of the crime fresh in the mind
19    of the judge. While it would not be a constitutional violation to forego parole altogether for certain
      crimes, what the state cannot constitutionally do is have a sham system where the judge promises
20    the possibility of parole, but because of the nature of the crime, the BPT effectively deletes such from
      the system. Nor can a parole system, where parole is mandated to be determined on someone's
21    future potential to harm the community, constitutionally exist where despite 20 or more years of
      prison life which indicates the absence of danger to the community in the future, the BPT
22    commissioners['] revulsion towards the crime itself, or some other unchanged circumstance,
      constitutes the alpha and omega of the decision. Nobody elected the BPT commissioners as
23    sentencing judges. Rather, in some realistic way, the facts of the unchanged circumstance must
      indicate a present danger to the community if released, and this can only be assessed not in a
24    vacuum, after four or five eligibility hearings, but counterpoised against the backdrop of prison
      events.

25    See Cerny v. Cal. Board of Prison Terms, 2010 WL 2640233, at *11 n.12 (C.D. Cal. Apr. 15, 2010), report and
26    recommendation adopted by, 2010 WL 2640225, at *1 (C.D. Cal. Jun. 24, 2010) (quoting Bair v. Folsom State Prison,
      2005 WL 2219220, at *12 n.3 (E.D. Cal. 2005), report and recommendation adopted by, 2005 WL 3081634 (E.D. Cal.
27    2005), aff'd, 235 Fed. Appx. 584 (9th Cir. 2007)).

28         [7]  The 2003 Board explained that Petitioner has only three 115s because one was reduced to a 128 (i.e. a
      counseling chrono).  Pet'r Mem., Ex. A (2003 Board decision).

youth, this isolated example does not provide evidence of current dangerousness.   Petitioner does not plan to live with his step-father upon release and, in fact, it appears his mother divorced this individual soon after Petitioner's incarceration.  See Pet'r Mem., Ex. D (2003 mental health evaluation at 7).   The record reflects no other "unstable" relationships; to the contrary, it shows that he has had consistent contact with, and support from, his mother and sisters.  See Lodgment 7 at 23-24, 28-29; Lodgment 9 (2008 psychological evaluation at 4-5) (noting that Petitioner "enjoys significant emotional support from family members and friends" and that Petitioner's prison file contains "numerous letters of support, written consistently from year to year"); Pet'r Mem., Ex. D (2003 mental health evaluation at 7) and (1995 psychological evaluation at 3).  Additionally, the record before this Court indicates that Petitioner has interacted well both with other prisoners and with prison staff during his decades of incarceration.  For instance, in the 2008 psychological evaluation, the forensic evaluator noted, "[t]here is no documented evidence of interpersonal conflict with staff or peers.  To the contrary, he is viewed as an asset by custody officers and appears to get along well with his peers."  Id. at 13.  And, since 2004, he has maintained employment doing clerical work in the Program B office and earned several laudatory chronos for his performance.  See Lodgment 9 at 5.  As such, there is no credible evidence that Petitioner has had, or continues to have, "a history of unstable or tumultuous relationships" or that his interactions with his step-father over forty years ago have any bearing on his current dangerousness.

**4.   Petitioner's Lack of Insight and Failure to Take Responsibility**

The Board also felt that Petitioner lacked "true insight" into his crime and failed to accept full responsibility.  Lodgment 7 at 113-17.  In elaborating on this point, the Board compared Petitioner's summary of the crime in the 2008 psychological evaluation to a summary he provided in an application for New House, a halfway house[8].[9]  Id.  Concluding that they were in "direct

---

[8]  The Board did not reference the date of Petitioner's application to New House and the application materials are not included in the record.

[9]  The Board read the following into the record and commented thereon:

In the psychological evaluation that was dated July the 23rd, 2008, you told the clinician, and I'm quoting:

conflict," the Board explained "we just don't believe that you really and truly understand the magnitude and nature of the crime, because you keep saying you're sorry for what you did, but you initiated the whole thing and therefore you are just as guilty and the jury found you just as guilty as the person that pulled the trigger." Id. at 117.

As Petitioner points out, "lack of insight" is not expressly listed in the California regulations as a factor to be considered in determining suitability for parole.  Traverse Mem. at 9 (citing Cal. Code Regs., tit. 15 §§ 2281, 2402).  Nonetheless, it has become a common theme in parole denials, as the California Court of Appeals recently explained:

> Before August 21, 2008, the date *Lawrence, supra,* 44 Cal.4th 1181, 82 Cal.Rptr.3d 169, 190 P.3d 535 and *Shaputis, supra,* 44 Cal.4th 1241, 82 Cal.Rptr.3d 213, 190 P.3d 573 were decided, virtually all decisions of the Board and Governor denying parole relied primarily on the gravity of the commitment offense. (See *Lawrence,* at p. 1206, 82 Cal.Rptr.3d 169, 190 P.3d 535 [noting "the practical reality that in every published judicial opinion [reviewing a parole decision], the decision of the Board or the Governor to deny or reverse a grant of parole has been founded in part or in whole upon a finding that the inmate committed the offense in an 'especially heinous, atrocious or cruel manner' "].) In the aftermath of *Lawrence* and *Shaputis,* the denial of parole now seems usually based, at least in part, upon the inmate's asserted "lack of insight" in some respect, which has become the new talisman.

---

"When asked to provide his version of the event that transpired during the life crime, he stated, 'Everyone at the party was high.  I can't remember details because I was on alcohol, heroin, weed, glue and spray paint.  One guy at the party accused the victim of making advances to his girlfriend.  He starting (sic) fighting with Mr. Foster, the victim.  Mr. Foster was winning, so we all beat him.  It went totally nuts.  I don't think anyone planned it, I think it was peer pressure, like the peer pressure you find here in prison.  It was also drugs and alcohol.  I accept full responsibility.  I went to Betty's house before Mr. Foster was shot.  I thought something bad would happen, but I wasn't sure.  I didn't want to be part of it.  Whatever the report said that I did then, I did it because I just didn't know, I was too drunk and high to know.  I will never know the details of what I did, so what the report says I did, I accept full responsibility.'"

Now, the problem with that, sir, is that the record that we have before us, and this includes the Appellate Decision, indicated you were the instigator that started all this by indicating that this guy pulled a knife on one of your crime partners. So, you may not have pulled the trigger, but you're still just as guilty as the individual that did this.  In your application to New House, when they asked you for an explanation as to have you ever been convicted of a violent crime, you indicated, and I'm quoting you:

"In 1977 I was arrested and convicted of a violent crime.  While under the influence of alcohol and drugs, I responded to a violent situation at a party that resulted in the unjustifiable death of Mr. Foster.  Although I had no direct involvement in its actual death, my lack of sympathy, emotional insensitivity, indifference to the sufferings (sic) of of (sic) others and my willingness to participate in this criminal act contributed to the tragic loss of life."

Lodgment 7 at 113-15.

1
2
3
4
5
6
7
8
9
10
11

        The intensified interest in this very subjective factor-which is *not* among the criteria indicative of unsuitability for release on parole set forth in the governing regulations (Regs., §§ 2281, 2402)-derives, of course, from the Supreme Court's opinion in *Shaputis,* in which the Governor's reversal of an award of parole was upheld because his reliance on the gravity of the inmate's commitment offense was coupled with concern about the inmate's "lack of insight into the murder and into the years of domestic violence that preceded it." ( *Shaputis, supra,* 44 Cal.4th at p. 1258, 82 Cal.Rptr.3d 213, 190 P.3d 573.) The weight placed on this factor by the *Shaputis* court has stimulated far greater use of it by the Board and Governor than was formerly the case. Considering that "lack of insight" is not among the factors indicative of unsuitability for parole specified in the sentencing regulations and has been rarely relied upon by the Board or Governor in the past, the increasing use of this factor is likely attributable to the belief of parole authorities that, as in *Shaputis,* "lack of insight" is more likely than any other factor to induce the courts to affirm the denial of parole. But the incantation of "lack of insight," a more subjective factor than those specified in the regulations as indicative of unsuitability, has no talismanic quality. Like all evidence relied upon to find an inmate unsuitable for release on parole, "lack of insight" is probative of unsuitability only to the extent that it is both (1) demonstrably shown by the record and (2) rationally indicative of the inmate's current dangerousness.

12  In re Calderon, 184 Cal. App. 4th 670, 688-690 (1st Dist. 2010) (finding "no basis at all in the

13  record" for the Governor's perception that the petitioner lacked insight).  It is noteworthy that

14  even the Shaputis court acknowledged the subjective nature of this element of its analysis, when

15  it explained that "expressions of insight and remorse will vary from prisoner to prisoner and that

16  there is no special formula for a prisoner to articulate in order to communicate that he or she has

17  gained insight into, and formed a commitment to ending, a previous pattern of violent behavior."

18  Shaputis, 44 Cal. 4th at 1260 n.18.

19          This Court's review of the record reveals that the Board's conclusion that Petitioner lacks

20  insight into, and minimizes his involvement in, the crime is not supported by the evidence.  As

21  an initial matter, the Board's selective quotation of one part of the 2008 psychological evaluation

22  without reference to other parts of the report is misleading.  For instance, in discussing

23  Petitioner's insight into his crime, the Board failed to consider the section of the report entitled

24  "Insight/Self Assessment."  There, Petitioner reports that at the time of the commitment offense,

25  he was only concerned with getting high all the time and "didn't think of others," whereas now

26  his "ability to think is not controlled by substances..." and he avoids conflict and makes good

27  decisions.  Lodgment 9 at 6-7.  Additionally, in the same section from which the Board quotes,

28  a section entitled "Inmate Understanding of Life Crime," Petitioner states that he deserved to be

punished for what he did and that, if given the chance to speak with Mr. Foster, he would "apologize sincerely for the treatment and abuse of him that [he] participated in." Id. at 10. When asked about making amends to Mr. Foster's remaining sister, Petitioner said "I would not want to justify my actions in any way. I would let her know that I'm truly, truly sorry. I would let her know that I should have done something to prevent it. I let it happen. I was part of it." Id. Finally, the Board fails to acknowledge the extensive efforts Petitioner has made to understand what led him to commit this crime and the role substance abuse played in his life. In the 2008 psychological evaluation, Petitioner summarized what he learned about himself during five years of intensive mental health courses followed by four years of weekly therapy with a psychiatrist and the reviewing psychologist noted that Petitioner's treatment records corroborated Petitioner's statements. Id. at 6.

The Board also ignores the consistent professional assessments indicating that Petitioner has taken sincere and full responsibility for his crime, has demonstrated insight into the factors contributing to his life crime, and presents a low risk of recidivism.[10] See Lodgment 9 at 9, 14-15; Pet'r Mem., Ex. D. As early as 1990, Petitioner admitted that he joined in the beating. Pet'r Mem., Ex. D (1990 diagnostic unit evaluation). The evaluator noted that Petitioner "seems to

---

[10] The clinicians who performed Petitioner's 2001 psychological evaluation provided an interesting perspective on the Board's review of Petitioner's expressions of insight and remorse. They stated:

There comes a time when nothing further can be achieved by additional incarceration, when an inmate has matured, complied with all regulatory expectations, and has returned twenty-four years of his life to the state for an irreversible event that occurred in his stuporous youth. Nothing more can be achieved or gained at this time by further delay in his release.

…

A final note must give recognition to the complexity of the interplay of a "New BPT Review Board" and an "old inmate.["] It has become axiomatic that the BPT will revisit the offending charges, often abetted by a visiting District Attorney. Each new BPT Board, of necessity, must independently assess Mr. Medway's level of true acceptance, acknowledgment, and remorse for this crime. For Mr. Medway, however, it becomes his twelfth retelling of the same events, his commitment to rehabilitation and remorse all with no apparent gain. He is, after all, still in prison. The interplay of the BPT and Mr. Medway, too frequently centers on the fault line of the offending crime, rather than centering on a true evaluation of his many years of progress psychological maturation, absence of prior history of violence or any indication through twenty-four years of incarceration of any tendency to violence.

Pet'r Mem., Ex. D (2001 psychological evaluation at 7-8).

be sincerely and appropriately remorseful for his actions" and "sincere in his stated desire to develop greater insight into his past behavior." Id.  Concluding that Petitioner's violence potential had greatly diminished, the evaluator opined that "[i]t is extremely unlikely that he could again fall to such depths of depravity, given his demonstrable gains in self-esteem and social skills." Id.  In brief assessments in 1994 and 1995, the reviewers concluded that Petitioner's violence potential was less than average for the prison population and recommended life-long participation in Alcoholics Anonymous ("AA"). Id. (1994 and 1995 psychological evaluations). Petitioner acknowledged during the 1995 interview that he did not attempt to stop the beating and also stressed his efforts (while in prison) to correct his thought patterns from the past. Id. (1995 psychological evaluation). From 1998 to 2001, evaluators concluded that Petitioner had rehabilitated himself to the extent possible within the CDC. Id. (1998 psychiatric report), (1999 psychological evaluation), (2001 psychological evaluation). In the 1999 and 2001 opinions, the evaluators concluded that Petitioner did not present "any risk of unlawful or dangerous behavior either within the prison setting or in the free community." Id. (1999 and 2001 psychological evaluations). In 2001, the psychiatrists stated "[w]hile the twenty-four years of incarceration given back to the state cannot give life to Mr. Foster, it is our strong medical opinion that Mr. Medway has satisfied all the intent of incarceration and rehabilitation demanded by the state and is justly deserving of release at this time." Id. (2001 psychological evaluation). Though the psychologist who evaluated Petitioner in 2002 and 2003 was less glowing in her review, she too noted that Petitioner's "long-term good disciplinary history suggested both improved self control and more effective coping strategies with maturing and increased self knowledge" and that Petitioner presented a "**low** risk for future violence in the absence of substance abuse." Id. (2003 mental health evaluation) (emphasis in original). She also acknowledged that Petitioner understands that alcohol and drugs have been his downfall and that he has made parole plans that provide for support in these areas. Id. Finally, in 2008, the reviewing psychologist concluded that Petitioner "has taken sincere and full responsibility for his life crime" and opined that Petitioner represented a "**low** risk of recidivism if released into the free community." Lodgment 9 at 15 (emphasis in original). The psychologist further noted that

Petitioner "displayed none of the five predictive factors for recidivism," one of which is "[l]ack of [i]nsight."[11]  Id. at 14.  In light of these positive reviews spanning two decades, the Court finds the Board's conclusion to be arbitrary.

To the extent the Board based its decision on its belief that Petitioner still minimizes his role in the crime, the evidence does not support this conclusion.  The Board stated "[y]ou accept responsibility for striking the individual, but not really being the cause of death, but you were the one that instigated all of this."  Lodgment 7 at 115.  As an initial matter, the regulations are clear that "[t]he board shall not require an admission of guilt to any crime for which the prisoner was committed."  Cal. Code Regs., tit. 15 § 2236; In re Caswell, 92 Cal. App. 4th 1017, 1033 (1st Dist. 2001).  Moreover, Respondent has provided no legal authority for the proposition that a prisoner's minimization of his involvement in the crime is a sufficient basis for denying parole.  It is true that Petitioner repeatedly stated that he was not the actual shooter, but this fact is not disputed.[12]  See e.g. Lodgment 7 at 19 (parole board reciting fact that Mr. Tomaio was the shooter).  Petitioner has, however, consistently taken responsibility for beating Mr. Foster, being indifferent to his suffering, participating in the conduct, and failing to stop the conduct.  Pet'r Mem., Ex. D (1990 diagnostic unit evaluation), (1995 psychological evaluation), (1998 psychiatric report), (2001 psychological evaluation), (2003 mental health evaluation).  He also has acknowledged that his memory of that evening's events is hazy due to the extreme amount of alcohol and drugs he had consumed, and has taken responsibility for anything else the trial record shows that he did that he cannot remember.  Lodgment 9 at 9[13].  Particularly striking was

---

[11]  The psychologist went on to explain that "'[i]nsight,' in the context of this instrument, is circumscribed primarily to a mental disorder.  Nonetheless, [Petitioner] has displayed considerable understanding of his former personality style as well as the additional contributing factors to his life crime.  Mr. Medway has integrated the 12-Step program into his life in a credible manner as a means of preventing future difficulties with substance use and with violence stemming from substance use."  Lodgment 9 at 14.

[12]  Though not relevant to the Court's review, the Court notes that the shooter, Mr. Tomaio, apparently was released after serving only seven years.  See Pet'r Mem., Ex. D (1999 psychological evaluation at 5).

[13]  When describing the life crime, Petitioner states that he went to Betty's house before Mr. Foster was shot then said:

Whatever the report says I did then I did it because I just don't know.  I was too drunk and high to know…I will never know the details of what I did…so what the report says I did I accept full

an incident discussed in Petitioner's 1990 Diagnostic Unit Evaluation.  When asked by another inmate during a group session why he did not take retribution against the individual who testified that Petitioner was present during the shooting (a fact Petitioner believes is untrue), Petitioner "indicated that he felt he did contribute to the crime and was appropriately being punished for this."  Pet'r Mem., Ex. D (1990 diagnostic unit evaluation at 2).  This evidentiary record does not support a finding that Petitioner minimizes his role in the murder or that any such minimization indicates his current dangerousness.

This case also is markedly distinguishable from <u>Shaputis</u> where the nexus between the prisoner's perceived lack of insight and his future dangerousness was readily apparent.  In <u>Shaputis</u>, the California Supreme Court accepted the Governor's use of the prisoner's "lack of insight" into the murder of his wife and the preceding abuse of his wives and family as an indicator of future dangerousness.  <u>Shaputis</u>, 44 Cal. 4th at 1255.  The record reflected that over the course of thirty years, Shaputis regularly abused his family.  <u>Id.</u> at 1246-47.  His daughter reported watching him jump on her mother's stomach until she miscarried.  <u>Id.</u> at 1246.  During his second marriage, Shaputis beat his wife so severely that she required plastic surgery.  <u>Id.</u> at 1247.  At one point, he also threatened to send his second wife "home in a box."  <u>Id.</u>  He was charged with raping one of his daughters and ultimately murdered the second wife.  <u>Id.</u> at 1245, 1248.  And, though the evidence at trial strongly suggested that the murder was intentional, Shaputis continued to claim at his parole hearings that the shooting was an accident.  <u>Id.</u> at 1259-60.  He also described himself as a mellow drinker, despite having a substantial drinking problem that contributed to his violence.  <u>Id.</u> at 1248.  The psychological report prepared in advance of the parole hearing confirmed that Shaputis "had a 'schizoid quality to interpersonal relationships,' and noted that [Shaputis] seemed to have 'limited … insight' regarding his antisocial behavior and the circumstance that his history of alcohol abuse was closely associated with his history of domestic violence."  <u>Id.</u> at 1251.  It further stated that Shaputis "found

responsibility for those things.

Lodgment 9 at 9.

'inexplicable' his daughters' prior allegations of molestation and domestic violence, that he had a flat affect when discussing these allegations, and that this circumstance could be a sign of the schizoid tendencies noted in some previous evaluations." Id. at 1252.  The California Supreme Court cited these findings in concluding that there was "some evidence" supporting the Governor's finding that Shaputis lacked insight into his crimes and remained dangerous.  Id. at 1260.

By contrast, Petitioner had no "previous pattern of violent behavior," has acknowledged his contributions to Mr. Foster's death, has expressed remorse for his crime, has gained insight into his behavior and beliefs that contributed to the offense, and has fully acknowledged the role his substance abuse played in the commitment offense.  Morever, Petitioner has remained alcohol and drug free for over thirty years, has acknowledged that he can never be even a social drinker, and has made arrangements to establish a support network outside of prison to help him stay clean and sober.[14]  And, unlike Shaputis, all of his clinicians have found that he expressed true insight and remorse and benefitted from prison programming.  In other words, nothing in the record before this Court suggests that any continuing lack of insight on Petitioner's part translates into a reasonable concern that he remains dangerous, even when considered in light of the heinous nature of the life crime.  See In re Roderick, 154 Cal. App. 4th 242, 272 (1st Dist. 2007) ("Ignoring the unanimous clinical evidence to the contrary presented by trained experts … the Panel's arbitrary pronouncement that [petitioner's] limited insight poses an unreasonable risk to public safety cannot be considered some evidence to support a denial of parole").

---

[14]  To the extent the Board's oft expressed concern that Petitioner will return to substance abuse factored into its decision that he lacked insight into his crime, the Court finds instructive the California Court of Appeal's analysis in In re Smith, 114 Cal. App. 4th 343 (6th Dist. 2003).  There, the court explained that past alcohol or drug abuse:

does not constitute some evidence that [an inmate] might start using drugs and become violent again, and therefore that he *currently* poses an unreasonable risk of danger without further treatment. Indeed, if [an inmate's] past use of drugs did invariably establish his unsuitability, then the Governor could deny parole for the rest of [the inmate's] life based on this immutable factor, without regard to or consideration of subsequent circumstances and evidence indicating that he has no current desire for drugs and that there is little current likelihood of drug relapse, let alone a return to violent conduct as a result of it.

In re Smith, 114 Cal. App. 4th 343, 372 (6th Dist. 2003).

1    It would be easy for the Court to say that because this Court must afford deference to the

2  Board's determination, and because assessments of insight and remorse are necessarily

3  subjective, the Board's finding is supported by "some evidence."  But to do so would essentially

4  make any parole denials based on these vague factors *de facto* unreviewable.  The Court finds

5  that inappropriate.  There is no evidence in the record that Petitioner lacks insight into his crime

6  or that he has failed to express remorse and the Board has not shown that it's conclusions to the

7  contrary are rationally indicative of Petitioner's current dangerousness.  See Calderon, 184 Cal.

8  App. 4th at 690.  The ultimate question before this Court is whether the Board's decision is

9  supported by "some evidence" of current dangerousness and, in this case, the Court finds that

10  it is not.

11    **5.    Petitioner's Attitude and Lack of Participation in Self-Help**

12    Here, the Board finds fault with Petitioner's sense of entitlement to parole, having been

13  granted parole in 2003 prior to the Governor's reversal, and his insistence on doing self-help

14  programs his own way.  Specifically, the Board objected that Petitioner is doing self-study,

15  instead of attending AA meetings, and not doing book reports to document his progress.

16  Lodgment 7 at 110.  They also felt he should have worked on the four specific issues the

17  Governor raised in his reversal, noting in particular that he has not participated in any formal

18  institutional programming since 2003.  Id. at 116.

19    Again, the Court finds these to be disingenuous bases for denying parole that are

20  unrelated to Petitioner's current dangerousness.  The psychologist who conducted the 2008

21  evaluation did not note any evidence of an attitude problem, explaining to the contrary that:

22    Since Mr. Medway's last appearance before the BPH, he has maintained his positive
    behavior and prosocial attitude...  His efforts to meet each of the recommendations
23    of the BPH have been well documented and comprehensive.  He has continued in
    the behaviors and activities that the BPH found both necessary and desirable for
24    a recommendation of parole.

25  Lodgment 9 at 15.  This conclusion is supported by the Court's review of the actions Petitioner

26  took in response to the Governor's comments.  Aside from the callousness of the commitment

27  offense, the Governor reversed the parole grant for four reasons: (1) Petitioner did not have a

28  job offer and his history and psychological reports indicate his violence potential increases if he

cannot find work, (2) Petitioner stopped attending AA/NA[15] in 1999 because of his "work schedule" and if he is unable to balance work and a substance abuse program inside of prison, he will be hard-pressed to do so outside (and his violence potential increases with substance abuse), (3) Petitioner minimizes his conduct and leadership role and refuses to accept responsibility for Mr. Foster's murder, and (4) Petitioner has not made progress via additional self-help or therapy since 1999.  Pet'r Mem., Ex. B.

In regard to the first reason, the Court finds that Petitioner's actions in response to the Governor's employment concerns[16] erased any valid basis for denial.  Prior to the 2008 parole hearing, Petitioner obtained a letter promising employment and presented it to the 2008 Board panel.  Id. at 71-72 (Board acknowledging that it had before it a letter confirming that Petitioner had a guaranteed job offer).  He also maintained his employment in the prison, thus adding additional years of clerical experience to the resume of marketable skills he could fall back on if for some reason he lost his job (Petitioner already had obtained marketable certifications in no less than four trades).  Finally, he obtained a letter from him mother (also signed by other family members and friends) representing that "[t]here is nothing [they] wouldn't do for [Petitioner] in terms of any support he might need" including providing "transportation, [f]inancial assistance, and assisting him in obtaining gainful employment."  Pet'r Mem., Ex. J (Letter of Support,

---

[15] "NA" stands for Narcotics Anonymous.

[16] The Governor expressed concern that Petitioner's violence potential would increase if he could not find work.  Pet'r Mem., Ex. B.  In support, he cited a sixteen year-old psychological report, which he said opined that Petitioner's "violence potential outside of prison would depend partially on his ability to find work."  Id.  The Governor went on to state that "Mr. Medway has been psychologically evaluated multiple times since 1988, and there is no indication that the earlier conclusion is not still valid."  Id.

In fact, the only opinion in the record directly addressing the employment issue since 1988 is one note in the 2008 psychological evaluation that:

Mr. Medway's risk of reoffense would *increase* if he: associated with negative peers; returned to the use of alcohol and/or illicit substances; engaged in conflictual (sic) social relationships; possessed a weapon; was unable to sustain gainful employment sufficient to meet his living expense; did not have a permanent residence that was free from alcohol, drugs, and weapons; or lost his social support network within his family or in the community.

Lodgment 9 at 15.  However, the psychologist concluded "[f]ortunately, Mr. Medway has a strong network of familial support and feasible parole plans that should maximize his ability to navigate the stressors and destabilizers he will encounter if paroled to the free community."  Id. at 14.

February 2008). These actions more than addressed the Governor's concerns, which were based upon a sixteen year-old psychological report (see Pet'r Mem., Ex. B).  Thus, the Governor's concern did not remain valid by the time of the 2008 parole hearing.

As to the Governor's suggestion that Petitioner could not balance a prison job and AA/NA, it appears the Governor misconstrued Petitioner's statement.  Petitioner actually explained that "[t]here was a problem with my work schedule after that [early 1999]." Pet'r Mem., Ex. D (2003 mental health evaluation at 12).  The psychologist who evaluated him in 2002 and 2003 also noted that Petitioner had not attended AA/NA meetings due to "work scheduling difficulties." Id. (2003 mental health evaluation at 28).[17]  This indicates that his work schedule and the meeting schedule directly *conflicted*, not that he simply could not balance them.  Furthermore, Petitioner's presentation to the 2008 Board of a list of every AA meeting in the Inland Empire and a letter promising help finding a sponsor (see Lodgment 7 at 67) shows that he did take action in response to the Governor's critique.

Because the Court already has addressed the Governor's third basis for his denial (see infra Part B.4), the Court moves on to the Governor's final concern—that Petitioner failed to take advantage of institutional programming since 1999.  This issue was addressed in the 2008 psychological evaluation, as follows:

> Mr. Medway stopped participating in self-help groups in 2003.  When asked about this, Mr. Medway said, "I've had a lot of good classes.  It reached the point where I was repeating the classes over and over.  I have the tools from the classes.  It just got to where I was repeating the content I had memorized." Documents from the BPH and from psychiatrists support the assertion that Mr. Medway completed and mastered all rehabilitation and personal development efforts that were and are available to him some years ago.  In 2002, the BPH concluded that increased personal maturity that comes with the passage of time was the only element of Mr. Medway's rehabilitation process that was not totally complete.  They made no suggestions for his programming and granted him parole the following year.

Lodgment 9 at 6.[18]  Respondent has offered nothing refuting this evidence.  Thus, to the extent

---

[17] A psychiatrist, who provided a letter clarifying ambiguities in the 2002 mental health evaluation, noted that "[t]he AA/NA programs at Centinela are limited and sporadic." Pet'r Mem., Ex. D (2002 Mental Health Addendum).

[18] The record before the 2008 Board indicates that Petitioner took an Anger Management class in 2001 and then nothing after that.  See Lodgment 7 at 86-87.

1  the Board based its parole denial on Petitioner's failure to repeat self-help classes, the Court finds

2  this to be a frivolous basis.  The same is true of the Board's suggestion that doing book reports

3  was necessary to demonstrate Petitioner's continued commitment to practicing the Twelve Steps

4  of AA.  See Lodgment 7 at 41-42, 117.  Petitioner explained that, in lieu of repeating self-help

5  courses, he engaged in self-study on a daily basis, and the Board acknowledged that self-study

6  generally was an acceptable alternative.  Id. at 41-42.  However, the Board discounted as

7  representing only Petitioner's "personal views" the written report Petitioner provided detailing his

8  analysis of how each of the Twelve Steps related to his life and what he has learned over the

9  years.[19]  Id. at 57, 61 & 117.  If engaging in this sort of reflection and remaining sober for over

10  thirty years[20], despite having access to alcohol and drugs[21], does not demonstrate a commitment

11  to sobriety, the Court fails to see how book reports will.  See Weir v. Curry, __ F. Supp. 2d __,

12  2010 WL 1222712, at *12 (N.D. Cal. Mar. 24, 2010) (finding no support in the record for Board's

13  finding that inmate failed to participate sufficiently in self-help based on inmate's failure to do

14  book reports); Nicholson v. Salazar, 2010 WL 2757132, at *2, *13 (C.D. Cal. Apr. 15, 2010),

15  report and recommendation adopted by, 2010 WL 2744267 (C.D. Cal. Jul. 7, 2010) (finding no

16  evidence supporting Board's parole denial though inmate did not do book reports as a way to

17  continue self-help work).  And ultimately, neither the Governor nor the Board explained what

18  further personal growth Petitioner needed to achieve through repeat, formal programming in

19  order to lessen his dangerousness and the Court finds no evidence that Petitioner's failure to

20  read self-help books or repeat programming over the last seven years makes him a current

---

[19]  Instead, the Board explained "we expect you to come in and identify a book that you've read and be able to discuss a couple of paragraphs as to how it affected you, and then you can give your personal views."  Lodgment 7 at 117.  The Board's attempted demarcation between Petitioner reading a book about sobriety and then providing his personal views versus providing his personal views on sobriety following decades of self-help and AA/NA classes is arbitrary and not indicative of Petitioner's current dangerousness.

[20]  The fact that Petitioner has remained sober while incarcerated is uncontradicted in the record.

[21]  Petitioner acknowledged during the 2008 psychological evaluation "I still have people offer me drugs and alcohol."  Lodgment 9 at 6.  One Board member also admitted "I'm not so naive not to know that there's not drugs and alcohol here within the prison."  Lodgment 7 at 60.

28

1   threat to the public.[22]

2   ### 6.    Unrealistic Parole Plans and Vague Job Offer

3   Petitioner's perceived lack of realistic parole plans was another ground upon which the

4   Board based its parole denial.  Petitioner informed the Board that his first choice was to stay at

5   a halfway house so they can help him with the transition, since he has been imprisoned for so

6   long.  Lodgment 7 at 64-65.  Though he had contacted a few halfway houses and provided the

7   Board with letters demonstrating this, he was unable to secure a bed in one until he obtained

8   a release date.  Id. at 66-67.  As a contingency plan, should Petitioner be released before any

9   beds became available, Petitioner explained that his niece had offered to let him stay in her guest

10  house.  Id. at 63-67.  In regard to employment, he provided the Board with a letter from a

11  roofing company, which stated "[t]his letter is to confirm that a 'Guaranteed Job Position' will be

12  immediately available to Samuel Lee Medway upon his release from the Custody of the California

13  Department of Corrections and Rehabilitation."  Pet'r Mem., Ex. M; Lodgment 7 at 71-72.

14  Petitioner represented that his sister, Cathy, had spoken with the employer and learned that

15  Petitioner would be paid between twelve and fifteen dollars per hour. Lodgment 7 at 73.  Earlier

16  in the hearing, the Board acknowledged that Petitioner earned his GED in 1982, had completed

17  vocational certificates for dry-cleaning, mill and cabinet work, janitorial services, and carpentry,

18  and had done clerical work in a prison office for at least the last five years.  Lodgment 7 at 38-

19  39; see also Lodgment 9 at 5 (confirming that Petitioner performed clerical work and received

20  several laudatory chronos for his performance).

21  In finding these plans deficient, the Board noted that they had not received a letter from

22  his niece supporting Petitioner's claim that he had an offer to stay with her upon release.[23]

23  Lodgment 7 at 118.  The Board's concern was that psychological assessments indicated that

24

25     [22] In fact, almost a decade ago, the psychiatrist who evaluated Petitioner for another parole hearing reported

26  "[t]he psychological reports have unambiguously stated that Mr. Medway has rehabilitated himself to the full extent possible with the CDC and it is the undersigned medical opinion that he does not represent a risk to society at this

27  present time." Pet'r Mem., Ex. D (2001 psychological evaluation at 1).

28     [23] The Board acknowledged the representation by Petitioner's attorney that he had spoken with the niece, but stated that they needed to see a letter.  Lodgment 7 at 118.

1   Petitioner was at greater risk of returning to substance abuse if he did not have a place to live.

2   Id.  They also were concerned that Petitioner did not know if the niece had alcohol or guns in

3   her house.  Id.  In regard to Petitioner's offer of employment, the Board expressed concern that

4   the letter mentioned that Petitioner had expressed an interest in being employed on a trial basis.

5   Id. at 119.  Specifically, the Board said:

6   > when we get a letter back like that, sir, we want to make sure that the guy says
>   he's going to have this job doing this type of work, making X amount dollars and
7   > he's going to be working three hours, twenty hours or forty hours.  If you go up
>   there and take this position and after the first week he doesn't want you, then
8   > you're back out there on the street again, and that's one of our concerns.

9   Id.  They went on to explain that they wanted "everything documented before you go out there"

10   because otherwise the Parole Division might investigate Petitioner's plans and find that they were

11   not viable.  Id. at 119-20.

12   By requiring Petitioner to have proof of a place to live and not just a written job offer, but

13   a more detailed letter regarding the offer, as prerequisites to a parole grant, the Board held

14   Petitioner to a higher burden than the California regulation requires.  The applicable regulation

15   lists as a factor indicating suitability for release that "[t]he prisoner has made realistic plans for

16   release or has developed marketable skills that can be put to use upon release."  Cal. Code

17   Regs., tit. 15 § 2281(d)(8) (emphasis added).  To qualify as "realistic" a plan need not be fool-

18   proof or iron-clad.   In re Andrade, 141 Cal. App. 4th 807, 817 (1st Dist. 2006) abrogated on

19   other grounds by Lawrence, 44 Cal. 4th at 1221.  Indeed, the regulation requires only "realistic

20   plans" or "marketable skills" and the Board acknowledged that Petitioner has four vocations.  It

21   would be unreasonable to require Petitioner, who already had been denied parole fifteen times

22   before this hearing, to secure a firm, and meticulously spelled out, job offer and a confirmed bed

23   in a halfway house when no employer or halfway house would have any reason to feel confident

24   that he would be released.[24]  See Cerny v. Cal. Board of Prison Terms, 2010 WL 2640233, at *15

25   _____

26   [24]  The Court believes Petitioner's mother said it best when she wrote in a 2008 letter to the Board:

27   How many, if any, prospective employers would offer employment to sight-unseen persons serving
indeterminate sentences before either the prospective employer or applicant knows or can predict
28   when the prisoner will parole?  This is an arbitrary and unrealistic burden to place on an incarcerated
prisoner because of the limited freedom placed upon them by the prison system.

(C.D. Cal. Apr. 15, 2010), <u>report and recommendation adopted by</u>, 2010 WL 2640225, at *1 (C.D. Cal. Jun. 24, 2010) (rejecting board's assertion that parole plans were not definitive enough and concluding that, where recovery houses would not offer definite placement without a parole date, "[i]t would be absurd to require that petitioner obtain something that is impossible to obtain as a prerequisite to suitability for parole"); <u>but see In re Cerny</u>, 178 Cal. App. 4th 1303, 1314 (1st Dist. 2009) (recognizing that board's requirement of acceptance into a residential treatment facility as prerequisite to parole, when acceptance without a parole date was impossible, placed inmate in "an untenable position," but nonetheless upholding board's denial on this basis, reasoning that it was the board's responsibility, not the court's, to strike the appropriate balance between protecting the public's safety and affording Cerny a realistic opportunity to secure parole).  In fact, the 2003 Board panel acknowledged as much when it said that "it's awful difficult" to get a job until you receive a parole date (Pet'r Mem., Ex. A at 67) and the 2008 Board panel admitted the same in saying "we do tell you that you're not required to have a job" (Lodgment 7 at 46).  Petitioner had "realistic plans for release" including a guaranteed job and two viable living arrangements.  In additional, Petitioner easily satisfied the second prong, having "developed marketable skills that can be put to use upon release," by obtaining four vocation certificates and a solid work history.  As such, Petitioner more than satisfied the regulation that indicates suitability for parole.

Furthermore, the determination that an inmate is suitable for parole is separate from the determination that a prisoner's parole plans are viable.  Once a life term prisoner is given a parole date, a parole agent investigates the prisoner's intended living arrangements and employment.  Cal. Dep't of Corr. & Rehab.: Adult Operations and Program Regulations, Dep't Operations Manual, Adult Parole Operations (hereinafter "Parole Manual"), ch. 8, art. I, § 81010.5.1; <u>see also</u> Lodgment 7 at 119-20 (Board acknowledging that "Parole Division is going to go out there and check this thing out to make sure that you are going to be hired doing the things that you say you're going to be doing and making the amount of money that you say

---

Pet'r Mem., Ex. J (Letter of Support, February 2008).

you're going to be making, and if you don't have that, then that would be grounds for them to say that your parole plans are not viable").  If the parole plans are not satisfactory, the parole agent contacts the inmate requesting information about alternate living arrangements or employment and may also contact relatives for assistance or make arrangements with a halfway house if no resources are available.  Parole Manual, ch. 8, art. I, § 81010.5.1.  And, if there is no feasible way to adjust the prisoner's release plans, his release may be rescinded.  Id.  Thus, the Board's concerns address issues properly addressed after parole has been granted.  The mere theoretical possibility that Petitioner will not find a bed in a halfway house, and then will be denied residence by his niece, and then will be fired from his job after a week, and then will be left out in the cold by his family[25], and therefore, will become homeless and return to drinking and violent crime after over thirty years of sobriety and good behavior is too attenuated a possibility upon which to find him ineligible for parole.  The Board's speculative fears do not constitute evidence that Petitioner represents a current danger to society and the Court would be abdicating its duties if it upheld such an arbitrary basis that is not hinged to any regulation or standard of review.  See Lawrence, 44 Cal. 4th at 1214 (recognizing that "the fundamental purpose of judicial review is to permit courts to provide a remedy for arbitrary decisions").

### 7.   District Attorney's Opposition

At the conclusion of its decision, the Board noted that both the District Attorney of San Bernardino County and the San Bernardino Police Department "indicate[d] an opposition to a finding of parole suitability."  Lodgment 7 at 120-21.  The Board did not elaborate as to whether this factored into its analysis and it's failure to do so suggests that the Board simply was complying with California Penal Code § 3046(c)'s mandate that the Board "shall" consider all statements and recommendations submitted by the trial judge, district attorney and/or sheriff and "shall enter on its order granting or denying parole to [life] prisoners, the fact that the statements and recommendations have been considered by it."  Cal. Penal Code § 3046(c)

---

[25]  The Board acknowledged a letter from Petitioner's mother, which was signed by many of Petitioner's family members and family friends, that stated: "There is nothing we wouldn't do for Sammy in terms of any support he might need at any time.  Be it a home, transportation, [f]inancial assistance, and assisting him in obtaining gainful employment."  Pet'r Mem., Ex. J ("Letter of Support, February 2008"); Lodgment 7 at 74-75.

1   (2001).  To the extent the Board actually relied upon this information as a basis for denying

2   Petitioner parole, such reliance would be improper.  As courts in California as well as this Circuit

3   have explained, "voiced opposition to parole is not an enumerated unsuitability factor ... and

4   such argument is not evidence of unsuitability."  In re Viray, 75 Cal. Rptr. 3d 190, 197 (4th Dist.

5   2008)[26] (citing People v. Breaux, 1 Cal. 4th 281, 313 (1991) ("it is axiomatic that argument is not

6   evidence")); Saldate v. Adams, 573 F. Supp. 3d 1303, 1310 (E.D. Cal. 2008).  Because the

7   district attorney's argument on the record (see Lodgment 7 at 88-90), and presumably the letter

8   from the sheriff the Board referenced but did not attach to its opinion, was just that, argument,

9   it cannot be considered "some evidence" supporting a parole denial.

10      **8.    Conclusion: The Board did not Establish a Nexus to the Commitment**
            **Offense**

11

12      As the Court noted at the outset of this analysis, the Board may consider the aggravated

13   nature of the commitment offense, but only if it establishes some nexus between the

14   commitment offense and a current finding of dangerousness.  Here, none of the factors offered

15   by the Board were supported by evidence in the record or indicative of current dangerousness.

16   Thus, the superior court's deference to the Board's decision was not reasonable.  See Cooke, 60

17   F.3d at 1214.  This Court, therefore, concludes that the California court's decision approving the

18   Board's parole denial was an unreasonable application of the California "some evidence"

19   requirement and was based on an unreasonable determination of the facts in light of the

20   evidence.  See Hayward, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2)); Pearson, 606

21   F.3d at 608.  Because such arbitrary applications of state law violate the federal Due Process

22   Clause, Lewis, 497 U.S. at 780, this Court **RECOMMENDS** that the Petition be **GRANTED**.

23   ///

24   ///

25

26   ───────────────

27      [26]  In this case, the California Supreme Court granted review of this opinion and then transferred the case
     back to the court of appeal for review in light of its recent opinions in In re Lawrence and In re Shaputis.  After

28   reconsidering its earlier parole grant in light of these cases, the court of appeal again found no evidence supporting
     the Governor's parole reversal and reiterated its earlier holding that the district attorney's argument does not
     constitute evidence.  See In re Viray on Habeas Corpus, 2009 WL 131999, at *7-*8 (4th Dist. Jan. 21, 2009).

**C.**      **Petitioner's Continued Imprisonment Does Not Violate the *Ex Post Facto* Clause**

In his second claim for relief, Petitioner argues that the state's continued retention of him violates the *Ex Post Facto* Clause because the Board has increased his term of imprisonment beyond the term allowed by the law under which he was sentenced.  Pet'r Mem. at 12-16. Petitioner explains that because he committed the crime in 1977, he was sentenced pursuant to the Indeterminate Sentencing Law ("ISL") instead of the Determinate Sentencing Law ("DSL") now in effect.  Id.  Under the ISL, Petitioner contends that the Board was directed to make every effort to establish a parole date the first time the prisoner appeared for a parole hearing and to focus primarily on the prisoner's progress towards rehabilitation.  Id. at 13.  The ISL also required the Board to calculate a proposed release date using a matrix that was created in order to encourage the setting of uniform and proportionate prison terms.  Id. at 14.  When the Board granted Petitioner parole in 2003, it used the matrix and concluded that his proposed release date was July 13, 1995.  Id. at 14 and Ex. N.  As this date has long since passed, Petitioner contends he is being held arbitrarily and must be released immediately.  Id. at 14, 16.

Article I, Section 10 of the United States Constitution forbids the States from passing any "ex post facto Law."  The Supreme Court has construed the *Ex Post Facto* Clause to mean that "[l]egislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts."  Collins v. Youngblood, 497 U.S. 37, 43 (1990).  A law violates the *Ex Post Facto* Clause if it is: (1) retrospective and (2) disadvantages the defendant affected by it by increasing the punishment for the crime or altering the definition of the crime.  Lynce v. Mathis, 519 U.S. 433, 441 (1997) (citing Weaver v. Graham, 450 U.S. 24, 29 (1981) and Collins, 497 U.S. at 50).

Here, the Board has not increased Petitioner's punishment.  Petitioner was sentenced to a term of seven years to life in prison.  The sentence contemplates a potential life term in prison. A grant of parole is not mandatory, it is merely possible.  While Petitioner may have expected to be released earlier and others convicted of the same crime may have been released sooner, the Board's decision to deny him parole has not enhanced his sentence.  The fact that the July 13, 1995 release date has passed also does not make this an *ex post facto* violation because the California Supreme Court has made clear that considerations of public safety outweigh the

1   legislative goal of setting uniform prison terms.  See In re Dannenberg, 34 Cal. 4th 1061, 1070-

2   71, 1091, 1098 (2005) (holding that the Board may find a prisoner unsuitable for parole on public

3   safety grounds without considering when the prisoner will be paroled or setting a release date)[27].

4   Accordingly, Petitioner is not entitled to federal habeas relief with respect to this claim.

5           However, because the Court finds that the Petition should be granted for the reasons set

6   forth above in relation to Petitioner's first claim for relief, it is relevant that the Board already has

7   calculated Petitioner's release date under California law.  Because the July 13, 1995 release date

8   passed over fifteen years ago, Respondent should be directed to release Petitioner within thirty

9   days of the date judgment is entered by the District Judge, subject to the parole restrictions set

10  forth by the 2003 Board panel.[28]  See McQuillion v. Duncan, 342 F.3d 1012, 1015-1016 (9th Cir.

11  2003) (affirming grant of habeas corpus relief on appeal after remand, and explaining that the

12  proper relief is immediate release rather than remand for further parole proceedings where no

13  evidence in the record supported the Board's determination that the petitioner was not suitable

14  for parole); Murr v. Marshall, 673 F. Supp. 2d 1028, 1057 (C.D. Cal. 2009) (holding that the

15  proper remedy was to order petitioner released on parole where date previously set by Board

16  already had passed); Martin v. Marshall, 448 F. Supp. 2d 1143, 1144-1145 (N.D. Cal. 2006)

17  (holding that where there was no evidence supporting the Governor's reversal of the Board's

18  grant of parole, remand for a further parole hearing would be futile and the proper relief was

19  immediate release on parole); Rosenkrantz, 444 F. Supp. 2d at 1087 (where the petitioner's

20  parole date has been determined under California law, and that date has passed, the proper

21  relief is to order petitioner released on parole).  Additionally, Petitioner's parole term should be

22

23          [27] In Lawrence, the California Supreme Court clarified the holding of Dannenberg, but did not alter or overrule
24  the Dannenberg Court's holding that the Board may deny parole based on public safety concerns without first setting
    calculating a proposed release date.

25          [28] Because the 2008 Board did not grant parole to Petitioner, it also did not identify which special parole
26  conditions, if any, were appropriate.  To rectify this deficiency, the Court reviewed the 2003 Board's decision granting
    parole.  See Pet'r Mem., Ex. A.  In that decision, the Board recommended four special parole conditions and provided
27  explanations for their imposition.  Id. at Decision Page 5.  The Court has reviewed the conditions and explanation and
    finds all of the special parole conditions appropriate.  If either party disagrees with these special parole conditions
28  or believes additional conditions should be imposed, the party should include the objections in the "Objections to
    Report and Recommendation" filed in response to this document.

reduced by the amount of time that has passed since November 24, 2008, the date of the 2008 Board's decision, and by including term credits to which he is entitled by law. McQuillion, 342 F.3d at 1015 (ordering prisoner's immediate release without parole where "three-year parole, which he would have been required to serve if he had been released on time [in 1994], has long since expired"); Mendoza v. Hernandez, 2008 WL 2018191, at *2 (S.D. Cal. May 7, 2008) ("directing that petitioner be paroled immediately; and directing that petitioner's parole term be reduced by the time that his incarceration has exceeded the Board's June 23, 2004 decision and by including term credits to which he is entitled by law").

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Judge issue an order: (1) approving and adopting this Report and Recommendation, (2) directing that judgment be entered granting the petition, (3) requiring Petitioner to be released subject to all general parole conditions and the special parole conditions identified by the 2003 Board decision (see infra note 28) within thirty days of the date judgment is entered by the District Judge, and (4) directing that Petitioner's parole term be reduced by the amount of time that has passed since November 24, 2008, and by including all term credits to which he is entitled by law.

**IT IS ORDERED** that no later than **October 8, 2010**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later that **October 29, 2010**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED.**

DATED:  September 16, 2010

BARBARA L. MAJOR
United States Magistrate Judge